And in the first case, for the appellant, it's Mr. Nicoletti and Mr. Stalacok Stalakis. And how are you breaking it down at the time? Your Honor, this is John Nicoletti. We have agreed that Stoltz will have a total of 11 minutes, 8 for the initial argument, 3 reserved for rebuttal. All right, and that means... Good morning, Your Honor, Nicholas Stalakis. Yes, DelTec will have the 5 minutes, and we're reserving 1 of that for rebuttal. Okay, and then on the appellee side, how are our counsel dividing at the time? Good morning, Your Honor. It's Edward Flood from Mediterranean Shipping Company. I'll be leading off, and I think we're each taking 5 minutes. Okay, Mr. Flood, you're first, and who's next? This is Mr. O'Connor representing Conti and NSC. We agree. We've agreed to go second, and 16 minutes between the three appellees, so we get a little over 5 minutes each. All right, and Mr. Johnson goes third. Good morning. Yes, and I go last. Okay, and so I will give you a 1-minute warning. When you have a minute left, thereabouts. And so let's begin with Mr. Nicoletti. May it please the Court. I am John Nicoletti, and I represent the appellant defendant Stoltz on this appeal. As an overview, it is submitted that the district court's Phase 2 decision undermines the very purpose of the IMDG Code, which is to promote the safe carriage of dangerous goods, and undermines general maritime safety. The district court's decision allows an ocean carrier, in this case NSC, to hide behind the information set forth in a single document, the dangerous goods declaration, without reference to any other information, within the possession of the carrier, for which it already knew it should have known. If this decision is deferred. Mr. Nicoletti, Mr. Nicoletti, one of the problems I have with this issue is that there were inconsistencies in the documents. You know, one document said one thing, another document said something else, which makes it harder for the carrier to really know what it should do. How do you respond to that? Yeah, go ahead. There was no inconsistency in the bill of lading instructions, which were requested by MSC in its booking confirmation under the customer note. MSC specifically requested that for purposes of safe space sewage, that the information provided to the carrier should be in the master bill of lading instructions. And that was pretty clear. That was very clear. They said stow away from heat, stow above deck for temperature monitoring. There was no inconsistency in any of those instructions that were given for this particular shipment. Moreover, if we go by the definition of what needed to be disclosed, if you look at the cases of CONSHIP and the MVBG Harmony, we require the court should also take into account the prior knowledge of the carrier in order to determine. Well, just on the issue of what's in the instructions for the master bill of lading, it says not to store it near heat sources and that it should be stored for temperature monitoring. But it doesn't say that there's a risk of explosion. And it doesn't say that this particular shipment was exposed to heat and therefore had a shorter time window. So is your position that that's not relevant information that had to be provided to the carrier? That is correct. That is not. The relevant information is how to handle the cargo to avoid heat sensitivity. And if you look at the information which MSC has. But isn't there a duty to warn of the risk? And isn't the risk a risk of explosion? And even if you say it shouldn't be stored near heat sources, the carrier doesn't know why it shouldn't be stored near heat sources. There's no explanation of the risk, is there? I disagree. If you look at the information that's in the material that was provided to the carrier, particularly at the terminal, NLT, they were given with a very detailed material safety data sheet for this particular shipment, which clearly outlined the hazardous polymerization dangers. In fact, MSC's home office in Antwerp, which controls the admission of all dangerous goods to be loaded and carried aboard their vessel, Mr. Vanderbilt specifically had in his possession numerous documents which outlined, one, the hazardous danger of polymerization, two, the temperatures that it should be maintained at. Let me interrupt for a minute. The fact that such information was available, I could have found that information likely had I just conducted enough research on my computer. But the point is to make an obvious and plain communication of particular dangers, both the type of explosion as well as the nature of the shipment, which was best known to the manufacturer and to the shipper itself. I mean, there was testimony that it was the customary way in the industry to communicate those immediate dangers in a reliable way. And I understand that you didn't take issue with that factual finding, but am I incorrect in that? Was the DGD relied on in the industry as the place to go for the communication of particular dangers that need to be dealt with? Well, one, we challenged the admissibility of the custom and practice because both experts basically gave you ipsit-dixit. They didn't point to any kind of written materials that, one, were out there in the general public, two, that each of the NVOCCs knew about the general rules put into the DGD, and three, and probably most importantly, MSC does not use the DGD for its stowage. It does not pass that on to its planners. As a matter of common sense, it seems to me the final DGD would be an important document. Whether it's as important as the district court found or not, I don't know, but it certainly would be significant, and the final DGDs here did not contain a heat warning. Is that not so? That is correct, but it did put the master bill of lighting instructions, which came the day before, and that is the manner in which MSC requested stowage information did contain the heat warning and the direction to stow on deck. In fact, if you look at the IMVG code, it's very restrictive as to what information goes on in the IMVG declaration. There are only five fields, and none of them relate to the characteristics of the cargo other than by the code and by the classification. As importantly, the only time additional information is authorized by the code, it actually identifies on the type of product what additional information should be in the DGD. But the very point here is the DGD is not a document which MSC uses at all for its safe handling of carriage. Their total claim is, and there's no finding of this, that the information As I follow you, if you're talking about a failure to warn, maybe the carrier could reasonably be expected to know something about the general characteristics of a substance that they've transported before, but they couldn't possibly be expected to know that this was packed earlier and was exposed to heat while it was awaiting shipping, and that was the fault of Stolten and Galtek, right? So then why wouldn't there be a duty to warn of those particular characteristics? Because that is a completely misleading premise. The cargo was filled on June 21st. The cargo was delivered to MSC on June 21st. At that time of delivery, the court found in Phase 1 it was a properly prepared and packaged shipment with no indication that it had been subjected, because it had not been subjected, to any kind of false or any kind of deleterious condition. The only time the product... You have one minute. One minute, Mr. Nicoletti. The only time the product was subjected to the conditions which the court says should have been notified of was while the goods were in the care, custody, and control of MSC through NLT and on the vessel itself. MSC certainly knew the cargo was going to be delivered on June 21st, because it could not be delivered to the port without their authorization. Two, they knew the vessel was going to arrive 10 days later. Three, they knew the length of the voyage, so nothing we could have told them about the durational period was not known to MSC when they themselves accepted the cargo at the terminal on June 21st. What makes this case different from the DG Harmony 5 is because this shipment was no different than the other 127 shipments which MSC accepted and carried prior to the Flaminia. Let me also suggest to you, Dr. Jess, direct your attention to Clause 15.1 of the Bill of Rights, which tells us that when we delivered the cargo to MSC, which is at New Orleans Terminal, we were required to give them the shipping document so that they could take it into the terminal. That shipping paper included the warnings and the MSCS, which outlines all of the hazardous natures of the cargo. I'm going to turn quickly to BDP and the vessel. Just on that point, wasn't there evidence that the terminal explained its normal procedures and you would have had to make a booking request if you thought there needed to be special handling of the cargo? No, what they said is that they don't take instructions from the shipper. That the only instructions they take and will follow will be from MSC. And we're never told. Stolz was never told. No NBOCC was ever told that all of your instructions had to go to MSC and that the terminal, which has its own common law independent responsibilities with the Bailey, could just do whatever it wanted, even though they got instructions from the shipper. All right, Mr. Nicoletti, thank you. We'll hear from your colleague, Mr. Salakis. I'd like to make two quick points, if the court will allow me. Go ahead, go ahead. On the indemnity from BDP, the court misdirected the approximate cost. It didn't matter whether or not the failure to put the instruction would cause the cargo to be loaded below deck. We know MSC puts everything below deck for the most part, based upon the findings. The key here is, had that clause, stow on deck, been on the middle lady, that would have surprised MSC of any option, in its standard terms, to place that cargo above deck. They would have had to. By putting it below deck, they have a contractual breach, which is the approximate cause of this casualty, as the court found that to be a major contributing factor to below deck stowage. So therefore, if they breached that contract, and that clause had been in it, we would not be here today. All right, and your second quick point? Is on the vessel, they found that the vessel, she should have found that the vessel's crew acted improperly by opening the mantel cover. There's no doubt about that. Both experts said that was an improper firefighting procedure, and that is the true cause of the explosion, because it allowed entry into the hull, which creates a general danger condition. She said, well, they didn't know about the specific danger. That's not the rule. The rule is the general expectation of the foreseeability of danger. When you open a cargo hull, where there's a fire, believed to be a fire, and it's a DG hull, you're asking for more fire. I just refer you to the moving back lamp. You don't open a closed door. All right, you have some rebuttal time. We'll hear from Mr. Stolakis. Thank you, Your Honor. Nicholas Stolakis for DelTec Corporation. As this court has properly noted, the shipper, that is us, we had duties here. We had the duty to prepare our cargo for safe carriage under normal voyage conditions, and we had the duty to warn the carrier of dangers that the carrier did not know or could not reasonably be expected to know. But it's important to remember that the carrier here has duties as well, and one of those duties is the duty to use due care to ascertain the nature of the goods, of the dangerous goods that it has chosen to transport. MSC here had the duty to act reasonably. That included the duty to follow the instructions that it was given, to use the knowledge it already had. The district court found that MSC did act reasonably. I mean, I don't think it was an issue about whether there was a duty, but this is a very fact-intensive analysis, and she really delved into the facts. Yes, Your Honor, she did. And the standard that she came up with we think is novel and it dangerously lessens the burdens on carriers because, in her view, the carrier has no duty to heed any warnings or instructions on anything other than the dangerous goods declaration. It does not have to use information it already has, and it can ignore all of this to the peril of the crew and the ship. She found that MSC, quote, substantial information regarding the heat-sensitive nature of the DVB before the Flaminia voyage. It had carried DVB 127 times. Part of, I think, her reasoning is that MSC knew generally about DVB, but that this particular shipment of DVB was, as we've heard many times now, a ticking time bomb because of the manner in which it was handled. What's your response to that? Well, I know she used that language in the Phase II decision, but here's what she said. In Phase I, she said that the DVB was not, quote, doomed to auto-polymerize, and it would not have done so for 70 days after filling, assuming that it was not chilled and oxygenated further. And it would not have auto-polymerized but for the higher-than-normal temperatures in the hold. So she also said that, had we disclosed on the dangerous goods declaration that DVB was heat-sensitive, she said that would have been sufficient. And our position is that we did disclose that. We disclosed that in all of the information that MSC got before this particular voyage, and we disclosed it as to this particular voyage. Let me ask this. So even if MSC might reasonably be expected to be aware that it's heat-sensitive or that they received the instructions for the bill of lading, just in terms of general negligence principles, wouldn't a shipper sending a product that is heat-sensitive or that could potentially explode, wouldn't you be obliged to put labeling on it? It can't possibly be that the carrier is required under, as a matter of reasonable care, to consult its databases whenever it's shipping any object. But just as a matter of reasonable care, couldn't you ensure that the carrier has warnings that are tied to the actual product? You mean warnings as to this particular shipment? Well, both, right? So the carrier might reasonably be expected to be aware of the general properties. And so then I would think, okay, maybe it's not a failure to warn, but maybe still a shipper who is taking reasonable care would still include extra warnings because you can't rely on the fact that maybe it exists in a database. And then second, there is the particular characteristics of this shipment, what the district court said created an extra danger that you would have a duty to warn about because the carrier might not reasonably know about that. So as to the first point, yes, it might've been better practice to put it on the dangerous goods declaration, but I don't think it was required. And the evidence here showed that MSC simply stows goods based on the carrier's conduct. So it treats all goods within the same UN number and class the same, whether or not we put this on the DGD or not wouldn't have mattered. And don't forget that here, MSC actually got this heat warning. Can we really conclude that if you had said this has been out in the sun for a number of days and is likely to explode, it wouldn't have affected the carrier's conduct? I don't think that was her finding that it was likely to explode, which she said. Well, the item itself is it's possible for it to explode when exposed to heat. And this particular shipment has been exposed to heat. Well, it's not, it's, it's, it's not likely or, or could explode. What it, what happens is, and this is unlike some other dangerous goods, cargo DVB is heat sensitive and it's not just temperature. There's a multivariable analysis. You're well over, but take another minute to finish up. Certainly your honor. And I think judgment actually had a second question there that I wanted to address, but I'm sorry. I'm I'm I'm. Oh, it was about that warning about the particular conditions. I think the particular conditions here, Even if, even if there was negligence on our part, and I'm not saying there was, we don't think there was because we think we warned properly and we prepared this. That doesn't excuse MSC negligence and not taking into account. All of the times that it issued up, it received dangerous goods declarations from us on DVB that had the heat warning. And all the times that it repeated that back to us in the seaway bills, it repeated those heat warnings back to us. There's no question. It knew that DVB could auto polymerize, that it was a polymer, that it was heat sensitive. Excuse me. Are you saying that if you weren't once. And they've acknowledged the warning once that in the future, you're excused from warning. How could that possibly be? No. What I'm saying is that the negligence of MSC here. If one issue is our negligence. The other issue is their negligence. It's perfectly possible for us to be negligent and them to be negligent. And their negligence here was not using the information. We warned them as to this particular voyage. They deleted that when they created the seaway bill. Now that. Your point is that they shouldn't be a zero is what you're arguing. I'm sorry. I kind of missed part of that. They shouldn't be at 0% liability is what you're correct. It is not a zero sum game. It is not mutually exclusive. All right. Thank you. You have a little bit of time for rebuttal. We'll hear from the other side. Thank you. Starting with Mr. Flood. Good morning. Your honors. Edward flood on behalf of the Pele and MSC. I'd like to begin by looking at the DG harmony. There's a reasonable awareness inquiry which set out there, which asks whether it would have been reasonable to expect the ferry to know the specific type and degree of danger posed by the cargo. So really what you're looking at is two aspects of the danger, two risks if you speak. The first aspect, the type of danger, arguably in this case a carrier may have been reasonable to expect the carrier to know the type of danger. What's the type of danger we've got here? That the DVB can polymerize if exposed to heat over time. But it's the degree of danger that MSC didn't know about. Nor could it have been expected to know about given the facts. This shipment. Well, don't we say in harmony that. Don't we say in harmony that if you are aware of the general danger, which is the first point you made, then we're not talking about strict liability under COGS. We're talking about negligence, right? Because it's a binary inquiry. I would, I would agree with that. Your honor. It's what I'm talking about here and addressing is failure to warn. Strict liability. Is it, is it tougher road? Although I would think that strict liability is applicable here for reasons I could go into later, but I'm really addressing this from a failure to warn point of view. None of the evidence that council talked about regarding the knowledge that MSC had prior to the shipment involved the degree of danger. It's the degree of danger, which made the shipment so much different. Let's accept that for a second. Let's accept that for a second. So you seem to be conceding that MSC had knowledge about the general propensity and the heat sensitivity, but not the particular dangers of this. Well, So even based on the, on the, on the first, on the general characteristics knowledge, wouldn't, wasn't it negligent to put the product in. Below deck in a hot pole that wasn't ventilated. No, your honor, because first of all, I think both are required. Under the standard, but really we did know it was heat sensitive, but it's questionable as to whether we also knew that it polymerized, but under the IMG code, what we're essentially doing is when they told us it was a 3082, they basically were telling us that we could still on deck below deck. The IMG code for that requirement allows for below deck stowage. They have the obligation to tell us that if the code isn't to be applied, they have to let us know that in the second. Right. So they, they sent over instructions for the bill of lading that said it should be stored above decks for temperature checks and it shouldn't be exposed to heat. Well, the master bill of lading is wrong for a number of reasons, your honor. If I may, the court summarily rejected this argument because the evidence is all to the contrary. Delta perfectly was acceptable with below deck stowage. They didn't want temperature monitoring aboard ship. The only reason you're asking for temperature monitoring on deck. Is so that they can see the temperature gauges. They also. There's a confusion of the record as to what Deltech told. BDP to get in the master bill of lading, but the instructions that ended up being communicated to MSC were don't expose it to heat. And keep it above deck for temperature monitoring, right?   I don't want to try from saying that it's a ticking time bomb and that we've gone out of the wrong port. I mean, they knew it was dangerous to go out of new Orleans, but they sent it out of new Orleans. Anyway, if we had known the. Just picking up on something that. That opposing counsel just said a moment ago. So it's possible for both parties to be negligent, right? So. Could it be that. The ship is negligent for exposing it to heat and not following those instructions and nevertheless. The shipper is negligent to not explaining the particular characteristics of the shipment, which added additional risks. Not on these facts, your honor, because they had to explain to us. I mean, they kind of misrepresented to us. The care in which the cargo was to be held. It has to be, they said it was to be done by the code. And 30 82. And the code allows for on deck and below deck stowage. One difficulty I have is the. The 0% fault in light of some of the things that are, are. Some of the court's findings 0% on the part of the vessel. Maybe it shouldn't be. A large percentage, but, but. I'm a little skeptical about the 0%. Well, your honor. If Delta wanted its card would handle differently. They had to. Tell us that the code. It's not the way to carry the cargo. I think the court specifically stated a specific warning is necessary to alert the carrier. That standard. I'm sorry, but I thought. I thought a moment ago, you just acknowledged that the instructions for the master bill of lading did not have that warning. So why is it that didn't need to pay attention to those? No, no. The master bill of lading did not have that warning. The instructions they sent over for the master bill of lading. What was communicated by the shipper to MSC had those warnings. That warning did not contain that. We had a greater degree of polymerization. It didn't talk anything about the greater risk. So what John deck. Okay. It's not required. All right. So what John deck is not required for state stowage. This was only a request for temperature monitoring, which in fact, they'll tech North still wanted. And this was not the proper means by which to convey the stowage. This request for special instruction. Could you, and by the way. Excuse me, could you clarify for me, please? What MSC's. Control and responsibility was for the. Material once it was delivered to the port of new Orleans. I understood your opposing counsel to say that this. That it's treatment while it was awaiting stowage on board. Was. Both known to, and within your. Control. Is that incorrect? No, we have, we have. An obligation to, to care for the cargo while it's at the terminal. There's no doubt about that. We carried in accordance with the IMTG code in the HMR. I mean, this is kind of the situation where. The shipper knowing that the cargo was dangerous going out of new Orleans without telling us. It's like putting a box on a conveyor belt. The conveyor belt being the IMTG code and then allowing it to go into the furnace and burning up. And then they claim later it shouldn't have gone into the furnace. But they told us that it had to go by the IMTG code. You're you're over your time, but why don't you take another minute to finish up? Okay. Basically. When we, when they tell us that it has to go by the IMTG code. They're basically telling us that we can still. Per those terms. And the shipper is has an obligation to be aware of the IMTG code as well. And so everything that happened to this cargo stowed out on the pier and on the ship was all foreseeable. And the only consequences, the consequences were completely foreseeable that this is how it would be treated. Because it was treated like a 3082, which allows for cargo to be stored on the pier and down below deck on the ship. And in a hole that's unventilated. And she found. One last, one last question about that. So, so. The council just said a moment ago that you were aware. That it was going to arrive on the 21st and you were aware that the ship was not going to arrive until 10 days later. So if it was actually delivered to you and it was in your care when it was at the port. And I agree. It's foreseeable that if it sits out there, there's going to be added danger, but, but. Here's the thing. Let me close with, we didn't know how they manufacture the product. We didn't know how they ship the project product. We didn't know that the logistics made a difference. The crucial element of this, of this cargo is. You have to prevent the temperature from rising to 80 Fahrenheit, which is a critical temperature. They chill this product in their plants. It starts at 44 F. What happened was, was because it came early, it was almost at 80 F when it was put on the ship. That's like 35 degrees that it increased. And as Dell tech themselves said, when the product gets above 80 F. The clock starts ticking. Well, we don't know how that product is inhibited. It's kept in the container. And it was that fact that the product was allowed to get up to 80 F, which really created the danger. We knew none of that. We knew none of the degree of the risk here. All right. Thank you. We'll, we'll hear from Mr. O'Connor. Good morning, your honors. Yes. I'm Eugene O'Connor and I represent the ship owner Conti and the ship's manager NSB. Most of the discussion that you've listened to so far this morning has to do with what warnings may or may not have been conveyed to MSC with regard to the characteristics of this DVB cargo and whether those warnings were sufficient or not. I would just like to point out that nobody's alleging that any of those warnings got to the ship for whatever reason they didn't get to the ship. All the information that the ship had was that this was an IMDG class nine 3042 cargo. That means it's a marine pollutant and it could be stowed on or under deck. So when we got the stow plan from MSC indicating stowage under deck, there was no reason to contest or dispute or question that decision. The opening of the lid and letting in and create and causing the spark Judge Forrest did the right thing at this trial. She listened to the marine firefighting experts. She characterized this as a battle of the experts and indeed it was. Two experts testified for the ship, Captain Brian Hall and for our opponents, Captain Tortura. The judge clearly throughout her opinion repeatedly states how impressed she was that Hall testified persuasively. But everyone seemed to all the experts seem to agree that you don't open the door when you think there's a fire behind it. But Captain Hall testified and the judge accepted at the opening of the man lid that it was not foreseeable that it would create an explosion. And that's because the crew already believed that there was a fire in the vessel. The ignition source was raging in the hull was the crew's belief. So opening a hatch, fear of a spark igniting chemical vapors was not foreseeable to the crew as Captain Hall testified. I'd like a couple of points that I'd like to make is that the judge found that there was no negligence on the managerial level by Conti and NSB regardless of how you judge the testimony, the actions of the crew. What about what about the CO2 tanks? I mean, it seemed that some of the protocols call for I don't remember the numbers, 150 tanks to be released. And instead there were only a few that were released. Captain Hall testified that guidance that the master can choose or not choose to follow. Here they were in the middle of the first shot of CO2 had no appreciable defect, not even reducing much less eliminating the smoke escaping from the hole. And so he ordered a second shot. And to reduce the to reduce the level, the explosive level of the contents of a hole, it's significantly lower than to reduce the level that will support a fire fire. You've got to get the oxygen level from 21 down to about 15 to prevent an explosion. You've got to get it down below 9 percent oxygen. So even a different protocol for the release of CO2 wouldn't have made any difference. And you're releasing CO2 every half an hour. You're going to run out in five hours. And the captain made a judgment call. They don't know what's caused this. They don't know if the fire is going to be limited to number four. They could have a fire in the engine room. So he decided to conserve his CO2, which Captain Hall found to be a reasonable decision. Have I answered your question? Yes, you answered it. Thank you. Okay. Let me move on. The findings of fact found five substantial three substantial factors. One was that caused the explosion. One was the 10 days. One was shipping through New Orleans, which directly contravenes Delta's own safe shipping protocol, which says you do not ship from New Orleans in the summertime. The second was the prolonged stay there 10 days. The tank container showed up for filling four days early, and they went ahead and loaded and sent them down to New Orleans. And the cargo sat there for 10 days. Both of those were considered to be substantial factors by the judge. The third was stowage below deck, which we've already gone through how that came to be. But the fact that it was stowed below deck adjacent to hot tanks of another chemical cargo DPA was a substantial factor. None of these have anything to do with Conti or NSP. Fourth factor, which she did not describe as substantial, was lack of ventilation, but there was no evidence. Well, let me tell you, state it the other way. The evidence is that is a judgment call by the deck officers on the ship, primarily the chief officer. He decides when to ventilate and when not. It's a judgment call. There is no... If the instruction that it shouldn't be exposed to heat ended up in the bill of lading or the way bills, would the shipper, would you have behaved differently? If we had received warnings that this stuff is susceptible to an explosion, and if it's contravenes the conditions that DelTec had enumerated in its protocol, the cargo would have been rejected. We have a testimony of the captain and the Marine superintendent and NSP that if they were told and they didn't have enough details about the cargo to carry it safely, it would be rejected. In fact, DelTec's own general manager Levine testified that on occasion, when they do take the temperature of DVV before it goes on the ship, it didn't happen in this case. When they do take the temperature, if it's up around, as Mr. Flood said, up around 80 days, they pull it back. They don't put it on the ship. Why don't you... You're over your time, but take a minute to finish up. Well, the point that I wanted to make is two of the judge's decisions have not been challenged on appeal and stand. One is Conti and NSP are entitled to the fire defense, so we have no liability for the substantial cargo damage caused by the explosion. And the second, which is the flip side of the successful cognitive fire defense or any cognitive defense, is that we're entitled to general average. However, the general average adjuster assesses that numbers in the future. Okay. Thank you. We'll hear from Mr. Johnson then. Good morning, Your Honor. In this case, Stoltz is trying to use an obvious clerical or administrative oversight by Deltek in not correcting its pre-2011 bill of lading shipping protocols in an effort to create perhaps an ambiguity or a conflict regarding the contract terms for the shipment. Your Honor, to borrow a phrase, in this case, facts are the foot soldiers in this case. The court heard from 82 witnesses live by deposition, by declaration of course examination, and about 483 exhibits over most of the three-week period of trial, with a day or two absent here and there. The issue regarding this temperature instruction is important. The temperature instruction from the facts of the case, Your Honor, is the temperature, STOA on deck for temperature monitoring is a holdover from the early days of the shipment of this product when they were trying to figure out what happens during gorges. By the time 2011 came along, Mr. Alphonte, the president, decided to change the instructions, and this instruction was removed from the protocols that were in effect at the time the Flaminia was loaded and about a year before that. So this instruction was never intended to be a part of this transaction. For example, when Stoltz sent a booking confirmation back to Deltek, it did not have that instruction. When Stoltz booked it with MSC, it did not have that instruction. When MSC sent its confirmation back to Stoltz, it did not have that instruction. The court was very clear. Could you just address the question of whether the absence of the stowage instructions from the master bill of lading that BDP prepared, didn't that deprive Stoltz of a defense in this case? It's a complicated, many-party interaction. Couldn't that have served as a platform for triggering other inquiries? Putting those words that are specific and more than just the UN number, I think that's what I understand Stoltz to be arguing. I'm not sure I understand what your position is on that. My position on the instruction that we're talking about, stowing deck for temperature monitoring, as I said, it was never intended to be a part of the transaction. The contract between Stoltz and MSC is governed by the service agreement and the standard terms and conditions of the MSC stowage bill of lading. Clause 18 in that bill of lading gives MSC the privilege to stow up, below, or on deck. I'm sorry, if it was never intended to be part of the transaction, then why was it in the instructions that were sent to MSC? Because, Your Honor, it became that way because my client put the instructions in. Deltech sent these instructions, not to Stoltz, they sent it to Panel Pena, who was earlier dismissed from this case, which acted as a straightforwarder. And they, Panel Pena, sent it to BDP, embedded within the Stoltz community for this transaction. And my client put those instructions on there because it was a clerical or administrative perfunctory job, quite frankly. But these instructions... Just to answer Judge Carney's question, putting aside how it was intended or whatever, let's assume that it was part of the instructions, which it was, and maybe shouldn't have been, but it was. If it had ended up in the master bill of lading or in the way bills, wouldn't it have made a difference for Stoltz? Meaning the carrier would have been contractually obligated to avoid heat and to stow it above deck for temperature monitoring? No, Your Honor, no. The answer to that question is no. And the reason is the record is replete, this extensive record is replete with the fact that when MSC plans its cargo, it does not look at seaway bills of lading, whether it's preliminary or final. It only looks at dangerous goods declaration in planning stowage, but even if MSC didn't look at it, aren't the instructions contained in the way bills a contractual obligation on their part? And so wouldn't it have been a breach if they didn't follow the instructions? No, Your Honor, I think the answer to your question is the earlier opinion of Judge Forrest in this, regarding Stoltz's motion for summary judgment on its contract claim against my client. The court said perhaps this insert, this stow on deck temperature monitoring instruction was an attempted modification of the prior contract. And the prior contract terms, Your Honor, were the service agreement and the standard MSC seaway bills, which Clause 18 provides what I said a minute ago for how MSC can stow this. And MSC rejected the term and did not put it on the seaway bill of lading. So it was an attempted modification of the contractual term. It was rejected by MSC. If it accidentally got on there, I think the argument would basically be that much like a Scribner's error in the contract line of cases, the intent of the parties never was to have that be part of this transaction. So you're saying if it did end up in the way bill,  Yes, exactly, Your Honor. All right, you're out of time. Why don't you take a minute to finish up? Well, Your Honor, I think that pretty much says it. Quite frankly, I think you have the opinions and you've heard all the arguments before. I really haven't some more to add, but thank you. All right, thank you. Mr. Nicoletti, rebuttal. Yes, let me direct the court's attention to the fact that it's taking time on an argument. It's really out of context. The court specifically found that when SCOF delivered the DVB tank containers to NOT, which is delivery to MSC, it had not been filled early, had not sat stagnant in the sun, and were in no danger of water pulverization. Rather, they were in proper condition for transport. Yeah, but when they came early to the manufacturer to fill it, shouldn't you have said, no, this is earlier than the cutoff dates? No, well, the cutoff dates are very important here. No matter how you judge the timeline, MSC requires the delivery of the containers to the port if it's going to make the intended vessel, I believe it's five or six days beforehand. So what we're really talking about is four days. We delivered it four days earlier than required by MSC. But again, we only deliver if MSC accepts it. They just as easily could have said, no, our dangerous goods cargos should be here five or six days prior, not ten. But they took on that responsibility when they accepted. In fact, the delivery to the port is very restrictive. You just can't drive off and drop the container off. Well, didn't Dell Tech reject an earlier cutoff date at one time? So, like, isn't there some, I mean, isn't there some duty on the part of the manufacturer to say, you know, that would be too early and it would be too in advance of the shipment? Well, what they said was they prefer to limit the number of days at the point. But again, there have been numerous shipments by Dell Tech through New Orleans and Houston which did arrive nine or ten days early. The point is, according to the accepted expert testimony, this cargo should have been good to 65 days, but for mishandling. The mishandling occurred solely while in the possession of MSC, NLT, and the vessel itself by putting it below deck. One minute. There was ample enough evidence in the record to show these people who had handled it and were instructed to do so. And what's more important is we did exactly what MSC wanted. Under 15.1 of the bill of lading, they tell us to give them the information at the time we deliver the cargo to NLT. We did exactly that. We gave them the straight bill of lading, which is the shipping document to allow entrance. That document had special instructions to keep away from heat. But most importantly, attached to the bill of lading was the MSDS. And you go right to the MSDS and it has the hazards of polymerization and explosion. They got these documents on numerous occasions. Turning quickly to the ship, there's no doubt opening the mandala was improper. What was improper in the decision was the court looked at a specific danger, that is the explosion, as opposed to the general danger. There was always a general danger when they opened the mandala. Turning to DDP, if those clauses were on the master bill of lading, that modified the contract of carriage, it would have been binding on MSC and stowage below deck would have been in breach. That would have given MSC, that would have given Stoltz a defense. But what about the argument that it was all a mistake, that that was in the instructions to begin with? That may have been a mistake by Deltek, and I don't know if it was or not, but it's irrelevant to us. Stoltz wanted those terms. And that's evidenced by the fact that we issue our own bill of lading, it's called a house bill that binds us to Deltek.  Therefore, those same terms should have been in the MSC bill of lading, and that would have given us the defense. And if they couldn't get it in that bill of lading, they should have told us. That thing is all random. DDP is completely liable to identify us for damages arising out of the missing terms that provided us our defense. The last thing I want to point out is that the opening of the mandala was so in progress because it occurred during the captain's third release of CO2. Quite contradictory. You don't open the mandala when there's a fire in, when your captain is trying to neuter the hole and render it harmless. These are completely improper actions and negligence on the part of the crew, and the dangers are always foreseeable when you open a closed door to an area trying to inert. You invite the rush of oxygen, you invite the increased dangers, particularly in a... If you already see smoke coming from the holes, you know that there is already a fire that is oxygenated. You don't expect an explosion to happen if there already is a fire that's receiving oxygen. Well, because if you look at the movie Backdraft, there was no oxygen in the room so they opened the door. So even though they might have inerted the hole, they completely nullified the CO2 discharge by opening the mandala because of the rush of air. And that's exactly what happened here. And on top of that, they are the spark. Thank you. Thank you very much. And we'll hear from Mr. Stalakis. I heard it said that it was not disputed that MSC would have rejected the shipment had it received our warning. The judge didn't believe that and probably because MSC, even though it had our instructions for years, had never rejected any DVB cargo or any other dangerous cargo before the Flaminia. The second point I wanted to make is that if MSC had simply followed the heat warning that we gave it here and before, we wouldn't be here today because the accident wouldn't have happened. But could you address this argument that the instructions for the master building were never intended to include those warnings? Well, they're conflating the two instructions on there. One was the heat warning and then one was still on deck for temperature monitoring. Those are separate. The heat warning was always intended to be carried through and it always was. There was some conflicting testimony on whether we wanted on deck storage or below deck storage. The bottom line was that we wanted this storage away from heat, whether that was below deck or on deck. Carriers have different policies about whether they will do temperature monitoring. Early on, some of them did, then some of them didn't. But that's a separate instruction from the heat warning. Had they followed the heat warning instruction, we wouldn't be here. All right. Thank you. The court will reserve decision. As you all may know, I was the trial judge on the Harmony case. So this case brings back lots of memories for me, some good and some not so good. Thank you. Thank you very much. And we'll move on to the next.